[Cite as *State v. Roswell*, 2022-Ohio-260.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| STATE OF OHIO,<br><br>    Plaintiff-Appellee,<br><br>- v -<br><br>GARY A. ROSWELL,<br><br>    Defendant-Appellant. | CASE NO. 2021-P-0045<br><br>Criminal Appeal from the<br>Court of Common Pleas<br><br>Trial Court No. 2020 CR 00440 |

## O P I N I O N

Decided: January 31, 2022
Judgment: Affirmed

*Victor V. Vigluicci*, Portage County Prosecutor, and *Pamela J. Holder*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*James R. Eskridge*, Megargel & Eskridge Co., LPA, 231 South Chestnut Street, Ravenna, OH 44266 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1}   Defendant-appellant, Gary A. Roswell, appeals the denial of his Motion to Suppress. For the following reasons, we affirm the decision of the court below.

{¶2}   On June 12, 2020, Roswell was indicted for Obstructing Justice, a felony of the fifth degree in violation of R.C. 2921.32. A second Obstructing Justice count was added in a supplemental indictment.

{¶3}   On November 12, 2020, Roswell filed a Motion to Suppress statements made as a result of roadside questioning, which was heard on November 30.

{¶4} On February 1, 2021, the trial court denied the Motion. The court made the following factual findings:

> On May 22, 2020, at approximately 10:21 p.m., Deputy Bradley of the Portage County Sheriff's Department was on duty on Route 59 in Ravenna Township, Portage County, Ohio.
>
> The deputy saw the Defendant's vehicle pull out of the drive of a known drug house. Deputy Bradley followed the vehicle and was unable to observe a visible license plate. The officer observed the vehicle commit a marked lanes violation, which prompted the deputy to pull the vehicle over.
>
> When the official initiated the stop, he saw the front-seat passenger crawl into the backseat.
>
> The vehicle was stopped on State Route 59 and Shorr Street. Deputy Diemert of the Portage County Sheriff's Department arrived soon after the stop to assist Officer Bradley.
>
> Diemert approached the vehicle and determined Clifford Parham was the passenger in the backseat. The officer could not see the other individual who crawled into the backseat.
>
> The officers asked the driver to exit the vehicle. He was asked where he was going and what he was doing. The Defendant told the officers that he picked up Mr. Parham and was taking him to the drive-through. When asked both Mr. Roswell and Mr. Parham claimed no one else was in the vehicle.
>
> Upon further questioning, the Defendant stated that they had pulled into the Dollar General on Rout[e] 59, as well, and the store was not open.
>
> The officer asked the Defendant for permission to search the vehicle, which was granted. The deputy found a me[t]al spoon in the front passenger side of Defendant's vehicle. A female was located in the trunk area of the vehicle. She stated she crawled into the trunk because she had an outstanding warrant.

2

After locating the female passenger, Cherish Hill in the trunk of the vehicle, the officers handcuffed her and read her Miranda Rights.

The officers then began to question Roswell again, asking him what was really going on. The Defendant told the officers that he picked Ms. Hill and Mr. Parham up to take them to the drive-through and then went to a house on State Route 59 and Shorr. The Defendant stated the person they were looking for was not home, so they left. Mr. Parham, when asked said, that they were going to pick up a friend, but he could not remember the person's name.

The officers, when questioned during the suppression hearing, admitted Miranda Warnings were not given to the Defendant, and that he was not free to leave the scene during their investigation.

The court concluded that the questioning of Roswell did not constitute custodial interrogation: "A noncustodial situation does not become a custodial one simply because the person is questioned."

{¶5} On February 25, 2021, Roswell pled no contest to one count of Obstructing Justice.

{¶6} On April 5, 2021, Roswell was sentenced to 12 months in the Intensive Supervision Program of the Portage County Adult Probation Department and 48 additional months under the General Division of Adult Probation.

{¶7} On April 27, 2021, Roswell filed a Notice of Appeal. On appeal, he raises the following assignment of error: "The Trial Court erred as a matter of law in overruling Appellant's Motion to Suppress Evidence."

{¶8} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "[A]n appellate court must accept the trial court's findings of fact if they are supported by

competent, credible evidence," but "must then independently determine, without deference to the conclusion of the trial court [i.e., de novo], whether the facts satisfy the applicable legal standard." *Id.*

{¶9}  "In *Miranda* [*v. Arizona*], 384 U.S. [436,] 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 [(1966)], the United States Supreme Court established procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution." *Cleveland v Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 8; *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("[t]he Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement–the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will"); Ohio Constitution, Article I, Section 10 ("[n]o person shall be compelled, in any criminal case, to be a witness against himself").

{¶10}  "The procedural safeguards identified in *Miranda* apply only when one is subjected to custodial interrogation." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 26.  "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Oles* at ¶ 9, quoting *Miranda* at 444.

{¶11}  In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the United States Supreme Court addressed the issue of "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation.'"  *Id.* at 435.  The Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to

4

such stops are not 'in custody' for the purposes of *Miranda*." *Id.* at 440. Although the stopping of an automobile and the detention of its occupants constitutes a "seizure" within the meaning of the Fourth Amendment, the circumstances of the usual traffic stop are more akin to an investigative detention or "Terry stop" rather than to a formal arrest. *Id.* at 436-439. "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439. However, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440.

{¶12} In reaching its conclusions, the Supreme Court in *Berkemer* noted the following:

> Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced to "speak where he would not otherwise do so freely," *Miranda v. Arizona*, 384 U.S., at 467. First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek. See *id.*, at 451.
>
> Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But

5

other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* itself, see 384 U.S., at 445, 491-498, and in the subsequent cases in which we have applied *Miranda*.

(Footnotes omitted.) *Id.* at 437-439.

{¶13} *Berkemer* has been applied in several decisions of the Ohio Supreme Court as well as this court. In *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, the Supreme Court determined that a motorist, detained pursuant to a routine traffic stop, was subjected to treatment that rendered him "in custody" for practical purposes and, therefore, was entitled to *Miranda*'s protections. The Court noted that Farris was subjected to an "extended detention * * * not based upon the purpose of the original stop, excessive speed, but * * * upon [Officer] Menges's detection of the scent of burnt marijuana." *Id.* at ¶ 12. Moreover, "Menges patted down Farris, took his car keys, instructed him to enter the cruiser, and told Farris that he was going to search Farris' car because of the scent of marijuana." *Id.* at ¶ 14. In light of these circumstances, the Court concluded that "a reasonable man in Farris's position would have understood himself to be in custody of a police officer as he sat in the cruiser." *Id.*

{¶14} In *Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, the Supreme Court reached a contrary conclusion, despite the motorist being questioned inside a police cruiser. The Court structured its analysis around three considerations. First, the

6

Case No. 2021-P-0045

intrusion was minimal: The stop occurred "in public view on the highway shoulder, and the trooper preformed procedures typical of a traffic stop." *Id.* at ¶ 26. Unlike the officer in *Farris*, the trooper in *Oles* "did not perform a pat-down search," "did not indicate that he wanted to search Oles's vehicle," and "permitted Oles to keep the vehicle's keys during the traffic stop." *Id.*

{¶15} Second, the questioning and detention were brief: "The trooper had a brief conversation with Oles to discern whether the odor of alcohol originated from Oles himself or from somewhere else in his car." *Id.* at ¶ 27.

{¶16} Third, the interaction was nonthreatening or nonintimidating: Oles was not handcuffed and did not object to the trooper's requests or questions which, in turn, were not "overly repetitive." *Id.* at ¶ 28. In *Farris*, by contrast, the officer "made it known that he suspected illegal conduct (i.e., that he smelled marijuana), told Farris that he would search the car, and the asked about illegal drugs and drug paraphernalia that he might find in the car." *Id.*

{¶17} In *State v. Serafin*, 11th Dist. Portage No. 2011-P-0036, 2012-Ohio-1456, this court held that *Miranda* warnings were not required when a trooper questioned a motorist, seated in the officer's vehicle, about how much he had had to drink. We noted that "Serafin was allowed to keep his keys and to keep his vehicle running and Trooper Ganley gave no indication that the detention would extend beyond the purposes of the initial stop for Speeding." *Id.* at ¶ 35. As in *Farris*, the motorist in *Serafin* was subjected to a pat-down search but we found this did not alter the non-custodial nature of the questioning: The search was nominally consensual – the trooper asked if he could

7

conduct a pat-down search for weapons – and concluded the search in a few seconds. *Id.* at ¶ 38.

{¶18} In *State v. Brocker*, 11th Dist. Portage No. 2014-P-0070, 2015-Ohio-3412, this court again found *Miranda* warnings were not warranted despite the motorist being questioned in a patrol car: "the detention was brief"; "the questioning was neither lengthy nor intimidating"; and "[t]he trooper did not take appellant's keys and did not search appellant's vehicle." *Id.* at ¶ 18.

{¶19} In *State v. Ferrell*, 2017-Ohio-9341, 91 N.E.3d 766 (11th Dist.), this court found that the passenger in a vehicle was entitled to *Miranda* warnings in the course of a traffic stop. The passenger was removed from the vehicle and, during a non-consensual pat-down search[1], a white substance was found in his socks. *Id.* at ¶ 3 and 32. With three officers present, Ferrell was asked twice what the substance was but did not respond. *Id.* at ¶ 33. He was then handcuffed and asked by one of the officers: are you "gonna be honest with me upfront, or are you gonna make it hard on yourself" since "I'm a nice guy as long as people are honest." *Id.* at ¶ 34. At this point, when Ferrell admitted the substance was dope, he was deemed in custody for the purposes of *Miranda*. *Id.* at ¶ 37.

{¶20} Finally, in *State v. Benson*, 11th Dist. Ashtabula No. 2018-A-0054, 2019-Ohio-3234, this court found that a passenger in a vehicle was entitled to *Miranda* warnings after admitting to the possession of drugs. While she was still a passenger in the vehicle, the officers' questioning of Benson reflected their suspicions that she was in possession of drugs: "I can already see how nervous you are getting", "[y]ou got something on you",

---

1. Ferrell gave consent for a search of his pockets, but officers expanded the scope of the search to include his socks where drugs were found. *Id.* at ¶ 21.

8

"where's it at?", "tell the truth," and "be honest." *Id.* at ¶ 9. The vehicle in which she was a passenger was "blocked in the rear by three police cruisers" and she was confronted by five officers upon exiting. *Id.* at ¶ 53. This court relied heavily on the nature of the officers' questioning of Benson in concluding that the *Miranda* warnings should have been given. "The questions from the outset of the stop were investigative as to Ms. Benson's crime of possession and possession for sale. Once Ms. Benson admitted to having 'speed,' and the police removed her from the vehicle, she was for all intents and purposes 'in custody.'" *Id.* at ¶ 56.

{¶21} Roswell argues that the following circumstances compelled the administration of the *Miranda* warnings before questioning him: "1) Appellant was detained by the side of the road during a traffic stop in which he was the driver of his own vehicle, 2) at the time Appellant was questioned, he was a criminal suspect as the vehicle he was driving was leaving a 'known drug house' in the City of Ravenna and a female passenger was observed jumping from the front passenger seat into the rear seats of the car and thereafter investigating officers could not see her person anymore because she was hiding in the trunk, 3) Appellant's freedom to leave was restricted as his driver's license was in the possession of the investigating deputy and the investigating deputy stated [during the suppression hearing] that he was not free to leave * * *[,] 4) there were 3 law enforcement officers there in total, 5) and he was not free to disobey the Deputies['] command to exit the vehicle upon the Deputy initially approaching his car." Brief of appellant at 11.

{¶22} Upon due consideration, we conclude that Roswell was not "in custody" for the purposes of requiring *Miranda* warnings prior to questioning. The stop in the present

9

case was a traffic stop and so, under *Berkemer*, *Miranda* warnings were not necessary unless Roswell were subjected to treatment that rendered him "in custody" for practical purposes. He was stopped for license plate and marked lanes violations, but further suspicions were immediately raised when one of the three passengers in the vehicle crawled into the backseat and disappeared. Two officers approached the vehicle. Bradley primarily engaged with Roswell while Diemert focused on the other passenger, Parham. A third officer arrived at the scene, but nothing in the record indicates what interaction, if any, she had with Roswell.

{¶23} The questioning of Roswell was neither intrusive, extended, nor threatening/intimidating. Officer Bradley asked for his license and had him exit the vehicle. But Roswell was not searched, handcuffed, or placed in a police cruiser and his vehicle remained running during the encounter. Roswell was asked about where he was coming from and going to and whether there was anyone else in the vehicle. He then gave consent to search his vehicle. After Hill was discovered in the trunk, Bradley returned to Roswell, still standing outside his vehicle, and asked, "what was really going on?".[2]

{¶24} Several points should be made in support of the holding that *Miranda* warnings were not necessary. The fact that Roswell drew the attention of law enforcement because he was observed leaving a known "drug house" is of no import in the present case as that fact had no discernable influence on the officer's conduct. Roswell was not questioned about narcotics and his person was not searched. Roswell

---

2. We acknowledge that Roswell distinguishes between the questioning that occurred before and after the discovery of Hill. In the present case, however, neither the discovery of Hill nor the question "what was really going on" materially alter the analysis as to whether *Miranda* warnings were required.

10

may have been the subject of a narcotics investigation at the time of the stop, but this did not render him "in custody" for the purposes of *Miranda*. As the United States Supreme Court recognized: "A policeman's unarticulated plan has no bearing on the question [of] whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.

{¶25} The officers' observation of a third person in the vehicle and request to search the vehicle did not alter the nature of the stop. The Supreme Court compared the typical traffic stop to a Terry stop in which an officer may ask "a moderate number of questions * * * to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439. Roswell and Parham were asked if anyone else was in the vehicle and then consent to search the vehicle was requested and given. The additional intrusion occasioned by the suspicions regarding a third passenger was relatively minimal and wholly justified by concern for the officers' safety. Moreover, there is nothing inherently illegal about hiding a passenger in the trunk unlike, by contrast, there is about hiding weapons or narcotics. Hiding a person is highly suspicious but not necessarily incriminating.

{¶26} The fact that Roswell was not free to leave the scene or disobey the officers' commands did not render him "in custody." The United States Supreme Court in *Berkemer* recognized that, "[u]nder the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission," and that "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Id.* at.

11

436.  Nevertheless, the Court concluded that the typical traffic stop did not trigger *Miranda* warnings.  The Ohio Supreme Court further clarified this point by noting the distinction between being "free to leave" and being "in custody":

> [T]he relevant inquiry is whether a reasonable person in the suspect's position would have understood himself or herself to be *in custody*.  This nuance is important and well reasoned.  If the inquiry were whether the driver felt free to leave, then every traffic stop could be considered a custodial interrogation * * *.  And a law-enforcement officer, in the midst of investigating a traffic stop and performing all its attendant procedures, would not consider a driver free to leave unless given permission.  But "not free to leave" and "in custody" are distinct concepts.

*Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, at ¶ 30.

{¶27}  In conclusion, this is not the situation in *Benson* where the suspect was confronted by five officers asking pointed questions about her already admitted drug possession.  Nor is it the situation in *Ferrell* where the suspect was subjected to a non-consensual search, handcuffed, and questioned repeatedly in a threatening manner.  In the present case, Roswell was not subjected to pressures in the course of the traffic stop that sufficiently impaired the free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.  *Berkemer* at 437.

{¶28}  The sole assignment of error is without merit.

{¶29}  For the foregoing reasons, the denial of Roswell's Motion to Suppress is affirmed.  Costs to be taxed against the appellant.


THOMAS R. WRIGHT, P.J.,

MARY JANE TRAPP, J.,

concur.

12

Case No. 2021-P-0045