[Cite as *Warman v. LivaNova Deutschland*, 2023-Ohio-4045.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DARREN WARMAN, | : | APPEAL NOS. C-230149 |
| | | C-230150 |
| Plaintiff-Appellant, | : | TRIAL NOS. A-2200202 |
| | | A-2203770 |
| vs. | : | |
| | | *O P I N I O N.* |
| LIVANOVA DEUTSCHLAND, GMBH, f.k.a. SORIN GROUP DEUTSCHLAND, GMBH, | : | |
| | : | |
| LIVANOVA USA, INC., | : | |
| LIVANOVA HOLDING USA, INC., | : | |
| TRIHEALTH, INC., | : | |
| and | : | |
| GOOD SAMARITAN HOSPITAL OF CINCINNATI, OHIO, | : | |
| Defendants-Appellees. | : | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 8, 2023

*Thomas Law Offices, PLLC,* and *Louis C. Schneider*, for Plaintiff-Appellant,

*Rendigs, Fry, Kiely & Dennis, LLP,* and *Brian Goldwasser*, for Defendants-Appellees *TriHealth, Inc.*, and *Good Samaritan Hospital of Cincinnati, Ohio*,

*Faegre Drinker Biddle & Reath, LLP*, *M. Joseph Winebrenner*, *Nelson Mullins Riley & Scarborough, LLP*, *Zachary C. Maciaszek* and *Dustin B. Rawlin*, for Defendants-Appellees *LivaNova Deutschland GMBH*, *LivaNova USA, Inc.*, and *LivaNova Holding USA, Inc.*

**BERGERON, Presiding Judge.**

{¶1} The overarching goal of Ohio's discovery rules is to prevent unfair surprise and concealment by facilitating the free flow of relevant information between parties. However, courts have broad discretion to manage the scope of discovery to ensure it remains "proportional to the needs of the case." Civ.R. 26(B)(1). Accordingly, when plaintiff-appellant Darren Warman proved unable to point to anything in his own medical records to substantiate his claim of injury (allegedly caused by defendant-appellee LivaNova's medical device), the trial court acted within its discretion to suspend discovery unless and until he could do so. The trial court afforded him ample time and opportunity to procure relevant expert evidence, but he mustered neither an opinion indicating that he actually suffered from the relevant condition nor any indication that some missing discovery would enable his expert to reach a diagnosis that would justify the lawsuit. On the limited facts in this record, the trial court acted within its discretion in dismissing his claims for failure to comply with its discovery order. We therefore affirm its judgment.

I.

{¶2} Mr. Warman underwent heart surgery in July 2015 at defendant-appellee Good Samaritan Hospital in Cincinnati. In January 2020, he received a letter from defendant-appellee TriHealth, Inc., notifying him that he may have been exposed to harmful bacteria emitted from LivaNova's Sorin Stockert 3T Heater-Cooler Device ("3T System"), which regulates the patient's blood temperature during heart surgeries. The 3T System is the subject of a federal multidistrict litigation ("MDL") centralized in the United States District Court for the Western District of Pennsylvania. There, plaintiffs typically allege that, due to design defects, the 3T System emits

3

Nontuberculous Mycobacteria ("NTM"), a group of bacteria that includes *Mycobacterium (M.) chimaera*, *M. abscessus*, and *M. fortiuitum*, among others. They contend that they contract infections, sometimes years later, resulting from exposure to aerosolized NTM emitted from the 3T System during heart surgeries. In total, plaintiffs have brought more than 200 cases relating to NTM exposure from 3T Systems in federal and state courts.

{¶3} Here, in multiple complaints, Mr. Warman claims he developed an infection after exposure to *M. chimaera* emitted by the 3T System during his 2015 surgery. He first sued Good Samaritan Hospital and TriHealth, Inc., (collectively, "hospital defendants") in July 2021, claiming common law negligence. After voluntarily dismissing that case without prejudice, he brought a separate complaint against the hospital defendants (as "suppliers") and multiple LivaNova entities (together, "LivaNova") (as the designer and manufacturer) for product liability claims under R.C. 2307.71. LivaNova immediately removed the latter case to a federal court, which then transferred it to the MDL court. The MDL court remanded the matter back to the Hamilton County Court of Common Pleas for lack of subject matter jurisdiction. Shortly thereafter, Mr. Warman refiled his negligence case against the hospital defendants. After the bouncing procedural ball finally came to a rest, the trial court consolidated the actions and issued a case management order ("CMO") in September 2022, setting deadlines for discovery, expert reports, and summary judgment motions.

{¶4} That same month, after the remand, Mr. Warman asked defendants for discovery. They balked, citing their pending motion to dismiss, and demanded some proof that he had actually developed a post-operative infection and that it had some causal connection to NTM emitted by the 3T System, as he claimed. Defendants

4

turned to the trial court later that month, moving it to modify its CMO to include a "tiered approach to discovery" under which the court would stay all discovery until Mr. Warman could support his claims with an expert opinion. The record does not show any initial discovery requests from either side, and we presume that none was served.

{¶5} In essence, defendants asked the court to impose a "Lone Pine" order. Under such an order, the trial court typically requires plaintiffs, under penalty of dismissal, to produce prima facie evidence of injury, exposure to the harmful substance or device in question, and causation. *See generally* Nora Freeman Engstrom, *The Lessons of Lone Pine*, 129 Yale L.J. 2 (2019). Though Lone Pine orders are somewhat common in mass toxic-tort litigation and MDL cases, trial courts rarely impose them in single-plaintiff cases (for a host of reasons that we need not explore here).

{¶6} The trial court considered defendants' motion at an October 2022 hearing. After first rejecting their motion to dismiss, the trial court entertained argument from Mr. Warman and defendants regarding the status of discovery, Mr. Warman's medical records, and what, if any, information he needed in discovery from defendants to establish the basis for his claims. Mr. Warman's counsel objected to defendants' motion, arguing he was entitled to complete discovery, but assured the court: "I've got all kinds of medical records that he's got an infection. Do you want me to have a doctor produce a report that my client got an infection as a result of the surgery? I can do that." Consistent with that admission, defendants argued that he would have everything he needed—namely, his own medical records—to both establish that he had some type of post-operative infection and that he had or has NTM in his system. The trial court agreed with defendants and instructed Mr. Warman "to show

me something that shows your client had this or currently has it" within 60 days, referring either to the presence of NTM in Mr. Warman's system or other evidence of an NTM-related infection. It added, "You got to show he's got it or you're out." However, it held defendants' motion in abeyance and made no definitive ruling regarding a stay of discovery.

{¶7} Mr. Warman's initial time ran out at a hearing in December 2022. By the time of the hearing, he had not produced an expert statement or other evidence of any post-operative infection (let alone one possibly linked to *M. chimaera*) despite his promises at the October hearing. Accordingly, the trial court granted defendants' motion to modify its CMO and issued an order that read, "Plaintiff shall produce an expert report substantiating the infection claimed in the Complaint on or before March 3, 2023. Discovery is hereby STAYED until Plaintiff produces said expert report." During the hearing, the court further stated "on March 3rd, at 1:30, you will all be here for report [sic]. It will be produced on that day or the cases will be dismissed." Notably, as Mr. Warman's counsel acknowledged, the court's March 3 deadline mirrored the court's original CMO deadline for his expert disclosure and report.

{¶8} The court dismissed Mr. Warman's claims on March 3, 2023 at 3:41 p.m. pursuant to its discovery order. Mr. Warman's counsel failed to appear at the status conference held that afternoon and had not yet filed an expert disclosure or report. A couple of hours after the dismissal, Mr. Warman filed an expert disclosure identifying an expert who would testify about "the risk of post-operative infection to Darren Warman as the result of Defendants' product(s)." In a letter attached to the filing, the expert states that Mr. Warman was exposed to the 3T System and "was *at risk* for [an NTM infection]," noting that NTM emitted by the system can incubate for

6

as long as five to seven years. (Emphasis added.) The expert did not comment on the fact that his report was being filed nearly eight years after the surgery. Nor did the expert discuss whether Mr. Warman developed any infection or unexplained negative symptoms after his surgery. Regarding discovery, the expert suggested:

> "Additional discovery and information would be beneficial as I develop my opinions in this case. This would include, but not be limited to, the information that [hospital defendants] has and had about NTM infections from the [3T Systems] they were using during their cardiac surgery procedures."

{¶9} Although their expert disclosure and reports were not due until April 2023, hospital defendants submitted an expert assessment in December 2022. After reviewing Mr. Warman's medical records and his complaints, their expert concluded "there is no objective evidence that Darren Warman developed any infection as a result of being exposed to [*M. chimaera*]" from the 3T System used in his July 2015 surgery. Further, the expert describes Mr. Warman's course of treatment after the surgery, including multiple blood cultures negative for *M. chimaera*. He identifies a pacemaker pocket infection that left him hospitalized for six days in April 2018, but notes that a culture from that infection site was positive only for *Pseudomonas*, a bacterium not connected to the 3T System. Mr. Warman's expert neither responded to hospital defendants' expert report nor contested its findings.

{¶10} Mr. Warman filed this appeal, arguing that the trial court unfairly truncated discovery. He cites no case law in his appellate brief, only raising arguments under Ohio's discovery rule, Civ.R. 26. In a single assignment of error, he challenges the dismissal resulting from his failure to comply with the court's discovery order.

7

II.

**{¶11}** Few Ohio appellate courts have had occasion to address the prudence of a Lone Pine order or a similar discovery order, and just one court has considered the issue in any depth. *See Simeone v. Girard City Bd. of Edn.*, 171 Ohio App.3d 633, 2007-Ohio-1775, 872 N.E.2d 344 (11th Dist.). Because the issue is insubstantially briefed in the appeal before us, and because the circumstances of this case do not facilitate a robust analysis of the potential benefits and drawbacks of Lone Pine orders,[1] we decline to discuss the overall legality and wisdom of such orders under Ohio law. Rather, for the narrow reasons stated below, we hold that the trial court did not abuse its discretion in staying discovery while requiring Mr. Warman to substantiate his injury. Nor did the court err in ordering dismissal of Mr. Warman's claims after he failed to provide even basic proof that he suffered an injury, an essential element of any tort claim.

**{¶12}** The trial court's order staying discovery while requiring Mr. Warman to produce evidence of an NTM-related infection is best characterized as a discovery order. *See, e.g., Simeone* at ¶ 23-24. In general, a trial court has broad discretion to regulate discovery, and orders concerning discovery matters will not be reversed absent an abuse of discretion. *State ex rel. Ebbing v. Ricketts*, 133 Ohio St.3d 339, 2012-Ohio-4699, 978 N.E.2d 188, ¶ 19. Abuse of discretion occurs when "a court exercis[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-

---

[1] It is also unclear that this order even constitutes a "Lone Pine" order because it only required proof of injury, rather than injury *and* causation.

8

3304, 187 N.E.3d 463, ¶ 35. Further, appellate courts reverse discovery orders " 'when the trial court has erroneously denied or limited discovery.' " *Mauzy v. Kelly Servs.*, 75 Ohio St.3d 578, 592, 664 N.E.2d 1272 (1996), quoting 8 Wright, Miller & Marcus, *Federal Practice and Procedure*, Section 2006 (2d Ed.1994). "Thus, 'an appellate court will reverse the decision of a trial court that extinguishes a party's right to discovery if the trial court's decision is improvident and affects the discovering party's substantial rights.' " *Mauzy* at 592, quoting *Rossman v. Rossman*, 47 Ohio App.2d 103, 110, 352 N.E.2d 149 (8th Dist.1975).

{¶13} Civ.R. 26 governs discovery matters. "Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Civ.R. 26(B)(1). In determining proportionality, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* According to a staff note regarding the July 2020 amendment to Civ.R. 26, which added the proportionality language, "[a] party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." 2020 Staff Note, Civ.R. 26. Further, "[t]he purpose of discovery under the civil rules is to prevent unfair surprise and the secreting of evidence by ensuring the free flow of information between the parties upon request." *Weckel v. Cole + Russell Architects*, 2013-Ohio-2718, 994 N.E.2d 885, ¶ 24 (1st Dist.). "[A] trial court's exercise of its discretion to end discovery 'must be justified by a

9

weightier interest than expediency,' particularly when * * * the party opposing discovery alone possessed the facts substantiating or disproving the matter in dispute." *Id.* at ¶ 33, quoting *Rossman* at 110. *Compare Dansberry v. Mercy Health-West Park*, 1st Dist. Hamilton No. C-210304, 2022-Ohio-260, ¶ 12-13, 17 (reversing trial court's denial of plaintiff's request for additional discovery when defendants obfuscated critical facts necessary to plaintiff's case).

{¶14} In Ohio's only significant case on Lone Pine orders, the Eleventh District held that "the trial court abused its discretion in prematurely issuing [a] 'Lone Pine' order" and that it further abused its discretion in dismissing plaintiffs' claims under Civ.R. 41(B)(1) for noncompliance with the order. *Simeone*, 171 Ohio App.3d 633, 2007-Ohio-1775, 872 N.E.2d 344, at ¶ 65. In *Simeone*, a group of students and teachers who attended and worked in an intermediate school building and suffered health problems sued defendants involved in constructing the building for various torts, including product liability claims. After plaintiffs requested discovery, defendants moved for a Lone Pine order. Plaintiffs filed a motion to compel discovery, but the court denied it and granted defendants' motion for a Lone Pine order six months later. They filed for reconsideration to compel discovery and submitted expert affidavits stating they could not meet the order's requirements without discovery from defendants, but the court kept its order in place. It required plaintiffs to identify their specific injuries, the contaminant they were exposed to, testing relied upon to show exposure, and expert opinions on causation. The court eventually dismissed the case for failure to comply over one year later.

{¶15} The *Simeone* court noted that the circumstances typically preceding a Lone Pine order—either a plaintiff's attempt to thwart discovery or their failure to set

forth a prima facie claim—were not present in that case. *Id.* at ¶ 43, 46. Because "there had yet to be any meaningful discovery" prior to the trial court's Lone Pine order, and because "the timing of the issuance of the 'Lone Pine' order * * * effectively and inappropriately supplanted the summary judgment procedure provided in Civ.R. 56," the court held that the trial court "put the cart before the horse" and denied plaintiffs "the procedural protections of Civ.R. 56." *Id.* at ¶ 42, 49, 53, 59.

{¶16} This case differs from *Simeone* in several important ways. First, in *Simeone*, plaintiffs "requested various tests and other documents that are in the privy of the appellees," and plaintiffs' experts claimed they could not comply with the trial court's "Lone Pine" order without reviewing those documents. *Id.* at ¶ 61. Here, however, Mr. Warman did not argue that he was denied access to any specific tests, documents, or other information from defendants that would have enabled his expert to substantiate whether he had an infection. Additionally, unlike the plaintiffs in *Simeone*, Mr. Warman never filed a motion to compel discovery (nor, as best we can tell, ever served discovery). In response to questions on this point at oral argument, Mr. Warman's counsel pointed to the court's blanket stay of all discovery, implying a motion to compel would have been a fool's errand. But even so, Mr. Warman had ample opportunity at both the October and December hearings to explain to the trial court what specific information in defendants' possession he needed to supplement his own medical records for the purpose of identifying an injury and connecting it to defendants' device (and actual, served discovery prior to the court's stay could have bolstered the point). His inability to do so suggests that the problem with filing a motion to compel was not just that it may have been met with skepticism or hostility; it was that the motion would have lacked specificity and substance.

11

{¶17} Furthermore, in the letter submitted in the evening after the case was dismissed, his expert merely indicated that he was in the process of reviewing Mr. Warman's medical records and that additional discovery from defendants would help him form an opinion. This letter contains no specifics in terms of what information is actually needed and why (beyond a suggestion that more evidence might be "beneficial"), nor does it even hint that Mr. Warman has or had any condition attributable to the 3T System. As the trial court concluded in issuing its discovery order, his medical records should contain sufficient information for his expert to at least conclude whether he even had an infection caused by *M. chimaera*. Mr. Warman's own counsel claimed as much—that he had "all kinds of medical records that he's got an infection"—at the October 2022 hearing, but by March 3, he could offer the court nothing to validate the point.

{¶18} Additionally, Mr. Warman's expert's assertion that *M. chimaera* infections are hard to diagnose and can incubate for five to seven years fails to reconcile that he wrote the letter more than seven years after Mr. Warman's July 2015 heart surgery. Finally, the expert never claimed that Mr. Warman's own medical records were lacking or deficient in any way.

{¶19} Contrast plaintiff's expert's letter with the report tendered by the defense expert in December. He describes the nature and purpose of Mr. Warman's July 2015 surgery (an aortic valve replacement) and subsequent course of care, which included placement of a permanent pacemaker and an April 2016 pacemaker pocket revision. Some complications arose from the revision, but Mr. Warman was consistently negative for fever, chills, or unexplained weight loss, symptoms common in *M. chimaera* infection cases. Following a February 2018 pacemaker malfunction

12

and subsequent replacement, Mr. Warman contracted a pacemaker pocket infection leading to a six-day hospital stay in April 2018. The defense expert discerns that multiple blood cultures were taken and were negative for *M. chimaera*, but a pocket site culture was positive for *Pseudomonas*, an unrelated bacterium. He further notes that throughout Mr. Warman's course of care from 2015 to 2021, his medical records indicate no suspicion for an NTM-related infection. He concluded, accordingly, that "it is not medically plausible that Mr. Warman would have infection due to [*M. chimaera*] for several years and not have significant systemic manifestations such as weight loss or anemia, or focal clinical manifestations, and positive cultures." Therefore, there was "no objective evidence that Darren Warman developed any infection as result of being exposed to [*M. chimaera*]." Mr. Warman's expert does not refute (or mention) these conclusions at all, even though the defense expert's report was filed more than two months prior to the plaintiff's report deadline.

{¶20} The vagueness of plaintiff's expert's letter dovetails with the lack of any discovery served (or at least filed) in this case. Generally, to show that a party has been denied a reasonable opportunity to obtain discovery, a party must show specifically what was needed and why, rather than just speculating that a smoking gun might emerge from a pile of documents. *See Dansberry*, 1st Dist. Hamilton No. C-210304, 2022-Ohio-260, at ¶ 12-14 (describing plaintiff's diligence in the litigation and her motion for additional discovery time to depose a key witness and criticizing defendant for "hiding critical facts," including the witness's identity). Of course, everyone might like more information, but Mr. Warman's expert never explains how that information would illuminate a diagnosis that could not be reached from the medical records alone.

13

**{¶21}** Ultimately, the trial court acted reasonably in concluding that, absent an explanation or a motion to compel to the contrary, Mr. Warman had all the evidence he needed to at least identify an injury potentially linked to the 3T System. And we also underscore that the trial court afforded Mr. Warman ample time here—in addition to the nine months between filing the claims in January 2022 and the October 2022 motions hearing, the trial court gave Mr. Warman nearly five additional months to procure an expert report. Furthermore, the final deadline the court provided for the expert report, March 3, 2023, matches the original due date for his expert disclosure and report established in the court's initial case management order from September 2022—the timeline could not have caught Mr. Warman or his expert off guard.

**{¶22}** Thus, the court's decision to stay discovery pending corroboration of Mr. Warman's injury is " 'justified by a weightier interest than efficiency.' " *Weckel*, 2013-Ohio-2718, 994 N.E.2d 885, at ¶ 33, quoting *Rossman*, 47 Ohio App.2d at 110, 352 N.E.2d 149. Rather than rushing Mr. Warman out the door, the court's order guarded against a potentially frivolous claim that, although sufficiently pleaded to survive a motion to dismiss, apparently lacked basic evidentiary support. Moreover, because Mr. Warman did not show that defendants were "secreting" information that they "alone possessed," and because the stay did not threaten to inflict "unfair surprise," the court's order does not undermine the purpose of Ohio's discovery rules. *Id.* at ¶ 24, 33. Instead, the court acted within the scope of its discretion in managing the scope of discovery under Civ.R. 26, ensuring discovery remained tailored to the needs of the case. We therefore conclude that the trial court did not abuse its discretion in imposing the discovery order.

III.

**{¶23}** The trial court's ultimate decision to dismiss the case for noncompliance with its discovery order is best characterized as an involuntary dismissal under Civ.R. 41(B)(1). "We review a decision to dismiss a case pursuant to Civ.R. 41(B)(1) for an abuse of discretion, and dismissals with prejudice are subject to heightened scrutiny." *Williams v. Metro*, 1st Dist. Hamilton No. C-190321, 2020-Ohio-3515, ¶ 23. "Despite the heightened scrutiny to which dismissals with prejudice are subject, this court will not hesitate to affirm the dismissal of an action when 'the conduct of a party is so negligent, irresponsible, contumacious or dilatory as to provide substantial grounds for a dismissal with prejudice for a failure to prosecute or obey a court order.' " *Quonset Hut, Inc. v. Ford Motor Co.*, 80 Ohio St.3d 46, 48, 684 N.E.2d 319 (1997), quoting *Tokles & Son v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 632, 605 N.E.2d 936 (1992).

**{¶24}** The trial court acted within its discretion in dismissing the case under Civ.R. 41(B)(1) for Mr. Warman's failure to comply with the court's order. From the trial court's admonishments at the October and December hearings, he had adequate notice of the trial court's intent to dismiss if he could not substantiate his claims. Even if it had considered the substance of Mr. Warman's expert disclosure and letter, tendered later in the evening following the court's dismissal, the disclosure and letter would not have changed the outcome—Mr. Warman failed to substantiate that he actually had an infection, rendering dismissal appropriate.

**{¶25}** Arguably, as the court explained in *Simeone*, a summary judgment motion might have been the more appropriate procedural avenue to dispose of these claims rather than an involuntary dismissal due to failure to comply with the court's

discovery order (particularly since the defense had already filed their expert report). But the interference with the summary judgment process motivating the court's decision in *Simeone* is not present here. In *Simeone*, the court explained that allowing a case to proceed through the normal summary judgment stage empowers the plaintiff to file a Civ.R. 56(F) motion to extend their time to respond when more discovery is needed. *Simeone*, 171 Ohio App.3d 633, 2007-Ohio-1775, 872 N.E.2d 344, at ¶ 56. The court further stated that a Civ.R. 56(F) motion could give plaintiff more time to "obtain affidavits from expert witnesses to successfully oppose" the summary judgment motion. *Id.* at ¶ 57. But here, in addition to the nine months between filing and the October 2022 hearing, the court gave Mr. Warman nearly five months to substantiate his claim with an expert opinion before dismissing the case. Additionally, in contrast to the plaintiffs in *Simeone*, Mr. Warman never identified what specific tests, documents, records, or other information he needed that would fill in the gaps for his expert. The trial court asked only for information that Mr. Warman's own medical records would have included, if it existed at all, and he asserts no deficiency or errors in his medical records, let alone any that could be resolved by defendants in discovery. Given Mr. Warman's inability to point to an injury in his medical history possibly attributable to defendants' medical device, we are satisfied that the court's discovery order and subsequent dismissal did not violate his substantial rights.

{¶26} Therefore, we conclude that the court acted within its discretion in dismissing Mr. Warman's cases with prejudice following his failure to satisfy the court's discovery order. Accordingly, we overrule his sole assignment of error and affirm the judgment of the trial court.

\*      \*      \*

**{¶27}**  In sum, although we decline to assess the overall legality and wisdom of Lone Pine orders under Ohio law, we hold that the trial court, in this instance, acted within its discretion in staying discovery until Mr. Warman could provide a basic evidentiary basis for an essential element of his claims.  Upon his failure to do so, the court acted within its discretion in dismissing his cases with prejudice.  We affirm the judgment of the trial court and overrule Mr. Warman's sole assignment of error.

Judgment affirmed.

**WINKLER** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.