[Cite as *In re Hirt*, 2026-Ohio-681.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY


In re Laura Hirt                                    COURT OF APPEALS NO. S-25-024

                                                   TRIAL COURT NO. MISC


                                                   **DECISION AND JUDGMENT**

                                                   Decided: February 27, 2026


* * * * *

Terry J. Lodge, Esq., for appellant.

Beth A. Tischler, Esq., Sandusky County Prosecutor and
Joshua D. Clark, Esq., Assistant Prosecutor for appellees.

* * * * *

**SULEK, J.**

{¶ 1} Appellant, Laura Hirt, appeals from a judgment entered by the Sandusky

County Court finding that there was probable cause to seize 110 of appellant's animals

and setting a bond in the amount of $281,168.00 for the first 60 days of care and

maintenance of the animals. For the reasons that follow, the trial court's judgment is affirmed.

## I. Statement of the Case and of the Facts

{¶ 2} Hirt, who was a licensed veterinarian, operated an animal rescue organization – known as Another Chance Sanctuary – out of her home. Among the 110 animals living on the property were cats, dogs, rabbits, birds, guinea pigs, alpacas, donkeys, goats, and a pig.

{¶ 3} On November 5, 2024, Sandusky County humane agent, Kelly Pocock, executed a search warrant at Hirt's residential premises. Assisting Pocock was forensic veterinarian Alba Michelle Gonzales. All 110 animals on the property were examined and their conditions documented. Most of the animals were found to be in some stage of neglect, from minor to severe.

{¶ 4} On November 12, 2024, Pocock met with Hirt and provided her with a compliance report containing a list of specific actions that needed to be taken for individual animals. There was a deadline of November 15, 2024, for some of the actions. Some, but not all, of those actions were timely made.

{¶ 5} On December 16, 2024, Pocock went to Hirt's premises for a final compliance check. Hirt still had not completed all the actions specified in the report.

{¶ 6} Three days later, a second search warrant was executed. Pursuant to that warrant, two sick cats were seized for medical evaluation and treatment. A probable

2.

cause hearing related to the seizure of the two cats took place in January 2025, and a finding of probable cause was made.

{¶ 7} On February 21, 2025, Hirt was indicted in Sandusky County Common Pleas Court case No. 25 CR 146, on five, fifth-degree felony counts of cruelty to companion animals, in violation of R.C. 959.131(C).

{¶ 8} On February 24, 2025, a third search warrant was issued, allowing for the search of Hirt's residence and the seizure of all her animals. The affidavit filed in support of the warrant alleged, among other things, that as of February 24, 2025 – more than two months after the December 16, 2024 deadline – Hirt had yet to complete the actions listed in the compliance order.

{¶ 9} On February 25, 2025, the search warrant was executed, and 110 animals of various breeds were seized from Hirt's personal residence. A hearing was set for April 10, 2025, in Sandusky County Court.

{¶ 10} Prior to the hearing, Hirt filed a motion to compel seeking discovery of "multiple documents and things from the Sandusky County Humane Officer in order to defend meaningfully at the…April 10, 2025 probable cause hearing." The trial court, finding that the State had already provided the necessary discovery, determined that Hirt's motion was moot.

{¶ 11} At the probable cause hearing, defense counsel challenged the validity of the third search warrant, stating that instead of presenting information in the supporting affidavit, the State had gone on a "fishing expedition" with the intention of making its

3.

case after the fact. Specifically, defense counsel objected to the statement: "This Affiant believes we will find further evidence to show Dr. Laura Hirt knowingly neglected the animals in her sanctuary that were under her direct care." The State responded that at the time of the February 25 seizure, there were five felony charges pending that were based upon prior seizures of Hirt's animals, and that the affiant had stated that she would likely find noncompliance with the previously issued compliance report when she arrived on the scene. In response to the State's argument, defense counsel stated:

> [A]t the time that the affidavit was signed, which was the 24th of February, it had been approximately two months and a week since the humane officer had been to my client's residence. Thus, she had no direct knowledge of any further alleged neglect or abuse of the animals.
>
> And when you take that, combined with the fact that there's a clear expression of intention to make the case up after executing a warrant, we believe there's no grounds for proceeding to probable cause determination.

The trial court dismissed defense counsel's challenge, and the hearing proceeded. The State presented testimony from witnesses Pocock and Gonzalez.

{¶ 12} Humane agent Pocock testified that the third search warrant, which was executed on February 25, 2025, was based on evidence of previous neglect. She further stated that Hirt was arrested on the day of the third search pursuant to an arrest warrant that was based on the five pending felony counts of animal cruelty.

{¶ 13} Pocock testified that upon executing the February 25 warrant, it was determined that all 110 animals were "suffering from something." Among the conditions discovered were ear mites, fleas, overgrown nails, severe ear infections, upper respiratory

4.

infections, skin issues, and eye issues. She testified as to compliance order items that, some three months after the compliance issue was ordered, were still not completed, including treatment of two dogs for severe ear infections.

{¶ 14} Pocock testified that there were unsanitary living quarters for rabbits living in Hirt's basement, with urine and feces on the floor. The rabbits themselves were found to be suffering from urine scald on their feet and fecal matting in the area around their rectums. The alpacas, two goats, and two donkeys were discovered to have overgrown hooves.

{¶ 15} According to Pocock, the living conditions she saw in February 2025 were about the same as they were in December 2024. Even more concerning to her were the medical conditions of the animals that were "[a]bout the same to worse."

{¶ 16} Based on the evidence of neglect and abuse that was found on February 25, all 110 animals were seized. Of those 110 animals, 107 required medical intervention.

{¶ 17} Pocock testified on cross-examination that she did not have any conversations with Hirt about completing the items in the compliance order after the December 16 deadline, because by that time Hirt had already informed Pocock that she was "done" and was not going to be compliant. Pocock further testified that by February 7, 2025, it was clear that the case would be heading toward prosecution and indictment.

{¶ 18} Dr. Gonzalez testified that she noticed during the execution of the February 2025 warrant that recommendations from previous visits had not been handled. Specifically, the bird cages remained too close to one another. One bird appeared to have

5.

a fractured wing. And all of the birds' beaks and nails were very long. Gonzalez stated that Hirt had failed to comply with a compliance report request that the birds be provided with a stone to allow them to file their own beaks and nails so they could eat and move around comfortably.

{¶ 19} Gonzales found fecal material on the couch and floor of Hirt's residence. She also observed a pig in the sunroom, without any food or water. There was a cat in a cage in the basement surgery room that appeared to have an eye ulcer. Despite a previous request that litter boxes be removed from the surgery room (for sanitation reasons), they were still there. The rabbit area was covered in feces and urine, and the rabbits themselves had evidence of scalding irritation of the skin due to persistent unsanitary conditions. Metal cages containing guinea pigs were soaked in urine, and the guinea pigs, too, had evidence of scalding on their feet. Cats in the barn area were found to have several respiratory issues.

{¶ 20} Each of the animals was inventoried and evaluated. According to Gonzalez, eight of approximately 25 dogs that were seized needed immediate care. Of the animals that were identified in November 2024 as needing dental care, fewer than half had received treatment. There were cats with ear mites and at least two dogs with severe ear infections. Most of the animals' problems were due to lack of care.

{¶ 21} Gonzalez classified the scene at Hirt's residence as "a high volume hoarding type situation," with overcrowded conditions and some of the worst neglect she had ever seen.

6.

{¶ 22} After Gonzalez concluded her testimony, the defense called witnesses Sharla McMaster and Marie McCormack to testify on behalf of Hirt.

{¶ 23} Sharla McMaster was a volunteer at Hirt's sanctuary and was present during the execution of the initial search warrant, in November 2024. She stated that the veterinarian who came examined the cats in the cat barn and concluded that all 25 cats had ear mites. Upon conducting her own investigation, McMaster concluded that only two of the cats had ear mites. She stated that despite her own findings, she treated all 25 cats, beginning in November. McMaster testified that she had last volunteered in the cat room of the sanctuary on February 10, 2025. She did not recall any cats having physical problems – including ear mites – at that time.

{¶ 24} Marie McCormack was also a volunteer at the sanctuary. She stated that her typical responsibilities as a volunteer included feeding the dogs, mopping the floors, and making sure there was clean bedding. In addition, she would feed the rabbits, alpacas, pigs, and, sometimes, the birds. McCormack clarified that she only fed the rabbits and was not responsible for cleaning up after them. She stated that if she noticed a problem with an animal, she notified Hirt who would take care of it.

{¶ 25} McCormack testified that she did not recall any unusual physical problems with the dogs when working with them as a volunteer in February 2025.

{¶ 26} At the conclusion of the testimony, defense counsel argued: 1) that the February 2025 search warrant was not adequately supported by the affidavit; 2) that the defense was not provided with adequate discovery; and 3) that R.C. 959.132 amounted to

7.

an unlawful forfeiture proceeding that does not follow the civil or criminal forfeiture requirements of Chapter 2981 of the Revised Code.

{¶ 27} After hearing from counsel for both sides, the trial court found that there was probable cause to seize the animals under R.C. 959.132 and moved immediately to a bond hearing.

{¶ 28} At the bond hearing, the State presented testimony by Humane World for Animals case manager Kassi Bennett, Humane World for Animals Director of Animal Crimes and Investigations Laura Koivula, and Dr. Gonzalez.

{¶ 29} Bennett testified as to the cost of care for all 110 of the seized animals, including the cost for the initial removal of the animals, veterinary care, and daily care, including food, bedding, supplies, staff time, and medicine administration. Bennett stated that the cost of daily care was $50 a day per dog and $30 a day per cat. Smaller animals cost $10 per day to maintain. Bird enclosures cost $50 a day to maintain, and donkeys cost $20.86 per day to maintain. And, finally, the daily costs to maintain goats, alpacas, and the pig were all around $10.50 each. Altogether, the cost of care for the first 30 days was $176,614.50, and the cost of ongoing care for days 31 to 60 was $104,553.50, for a total of $281,168.00.

{¶ 30} Koivula confirmed that the numbers testified to by Bennett accurately reflected the expenditures related to Hirt's animals that were made by her organization. Koivula further testified that certain veterinary procedures had to be pre-approved by the

8.

lead veterinarian – in this case, Dr. Gonzalez – and the State, and that such approval was received prior to those procedures being performed on any of Hirt's animals.

{¶ 31} Dr. Gonzalez testified that she was familiar with the care that was provided to the animals, but that she was not directly involved in every service that was given. Gonzalez testified that the listed charges were reasonable and that every intervention performed was, in her opinion, required. She further testified that it was she who evaluated each of the animals and then helped to create the compliance report listing items that needed to be improved for the animals to be permitted to remain with Hirt. The goal, she stated, was never to remove the animals.

{¶ 32} Defense counsel cross-examined the State's witnesses, but the defense presented no witnesses of its own with respect to the issue of bond. In closing argument, defense counsel merely stated that Hirt opposed the $281,168.00 bond as "absurd." The trial court, expressing surprise that the figure was as low as it was, set bond at $176,614.50 for the first 30 days and at $104,53.50 for the next 30 days. The trial court further stated that the bond would be due on April 21, 2025, and that absent payment, the State would thereafter be permitted to move for forfeiture of the animals. Hirt never paid the set bond amount. The State filed a motion for forfeiture of the animals, which the trial court granted on April 22, 2025.

{¶ 33} On August 1, 2025, Hirt pleaded guilty to the five felony counts in the indictment in case No. 25 CR 146. She was accepted into a pretrial diversion program, during which period she agreed, among other things, not to own, harbor, keep, or care for

9.

any animals. The Sandusky County Common Pleas Court ordered that upon Hirt's successful completion of the terms of the diversion program, the criminal charges would be dismissed.

{¶ 34} The trial court's finding of probable cause and its subsequent setting of bond in the total amount of $281,168 for the first 60 days of care and maintenance of the animals in the current case forms the basis of this appeal.

## II. Assignments of Error

{¶ 35} On appeal, Hirt asserts the following three assignments of error:

I.   It was error for the trial court to deny veterinary records and other discovery to Appellant prior to the O.R.C. § 959.132 probable cause hearing.

II.  The search warrant was granted on the basis of post hoc allegations and its execution was a constitutionally-defective search.

III. The O.R.C. § 959.132 procedure is unconstitutional because it is confiscatory, is effectively an in personam criminal statute and lacks proportionality.

## III. Law and Analysis

{¶ 36} At the outset of our analysis, we address the State's argument that Hirt's guilty plea in case No. 25 CR 146 "rendered all challenged pre-trial rulings moot." We disagree. Without addressing the details of the State's argument, we recognize that the guilty plea in case No. 25 CR 146 related to searches that occurred and an indictment issued *before* the February 25, 2025 search and seizure of the animals in this case. As such, the guilty plea in case No. 25 CR 146 case cannot constitute a basis for waiver of

10.

any pretrial challenges in the instant matter. Having rejected the State's argument in favor of reversal, we turn now to a review of each of Hirt's assignments of error.

{¶ 37} R.C. 959.131 establishes criminal prohibitions against companion animal cruelty. R.C. 959.132 provides a parallel but distinct procedural framework governing the seizure and impoundment of companion animals suspected of being subjects of animal cruelty offenses.

{¶ 38} R.C. 959.132(B) provides that an officer may seize and impound an animal if the officer has probable cause to believe the animal is the subject of an offense set forth in Chapter 959. of the Revised Code. The officer must provide the owner with written notice of the seizure and advise that a hearing will be held on the act of impoundment within ten days after the notice is provided (or at the next available court date). R.C. 959.132(C). At the hearing, the court must determine if the officer had probable cause to seize the animal. R.C. 959.132(E)(1). If probable cause does not exist, the animal must be returned to the owner. R.C. 959.132(E)(2). If the court decides that probable cause exists, the court will determine the amount of a bond or cash deposit that is needed to provide for the animal's care and keeping for not less than thirty days beginning on the date when the animal was impounded; the owner shall post such bond or cash deposit, and the case shall continue. R.C. 959.132(E)(3).

{¶ 39} Courts considering procedural due process implications of R.C. 959.131 and R.C. 959.132 have explained that "[p]et owners do not have a protected interest in a probable cause hearing under Ohio Revised Code § 959.132 but they do have a protected

11.

property interest in their [pets]." *Thompson v. Animal Welfare Leage of Trumbull County, Inc.*, 610 F.Supp.3d 1022 (N.D. Ohio Eastern Division 2022), citing *Cook v. Takacs*, 808 Fed.Appx. 373, 375-376 (6th Cir. 2020) (additional citation omitted). In considering due process claims, we recognize that "'[c]onstitutional benchmarks' are the metric of 'what process is due' rather than 'state law or ordinances.'" *Id.,* quoting *Chandler v. Village of Chagrin Falls,* 296 Fed.Appx. 463, 471 (6th Cir. 2008); *see also Cook* at 376.

{¶ 40} "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also State v. Smith*, 2017-Ohio-359, ¶ 33 (9th Dist.). "To establish a procedural due process claim, a plaintiff must show: 1) the existence of a protected property interest at issue, 2) a deprivation of that protected property interest and 3) that the plaintiff was not afforded adequate procedures." *Animal Welfare* at 1028, citing *Paterek v. Village of Armada*, 801 F.3d 630, 649 (6th Cir. 2015). In determining the adequacy of the procedures afforded, the court must balance: "1) the private interest that will be affected by the official action, 2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards and 3) the Government's interest and burdens that additional or substitute procedural requirements would entail." *Mathews* at 335. While pet owners clearly have a protected interest in

12.

their pets, there is also "a strong governmental interest" in the ability "to seize and impound animals that may be in imminent danger of harm." *Cook* at 376.

## A. First Assignment of Error

{¶ 41} Hirt argues in her first assignment of error that she was entitled to obtain discovery beyond the February 24 search warrant documents and "summary information" of the $281,168.00 in upkeep charges that she received. Her unanswered discovery requests – deemed moot by the trial court – included, among other things, photographs, videos or audio recordings that were made on or about February 25, 2025 at the Hirt residence; the name and address of all veterinarians engaged in any capacity relative to the animals seized on February 25, 2025; copies of all contracts, agreements and other writings between Sandusky County and organizations that had participated in the seizure, impoundment, and keeping of the animals seized on February 25, 2025; medical and financial records substantiating each and every financial charge listed in the Humane World For Animals' March 10, 2025 estimate of $163,083.10; all writings between the entities keeping and impounding the animals seized, or who were providing goods and services, and the agent or official of Sandusky County by which approval of any expenditures had been given; and a list of all witnesses, along with their respective curricula vitae or resumes, which Sandusky County intended to call at the hearing convened pursuant to R.C. 959.132.

{¶ 42} In reviewing Hirt's first assignment of error, it must be determined whether the Ohio Rules of Civil Procedure apply to hearings held pursuant to R.C. 959.132.

13.

**{¶ 43}** Ohio Civil Rule 1(C) provides that to the extent the civil rules would by their nature be clearly inapplicable, they do not apply in "special statutory proceedings." Civ.R. 1(C)(8). On the other hand, "where the statute provides for procedure by a general or specific reference to all the statutes governing procedure in civil actions such procedure shall be in accordance with these rules." *Id.* Thus, Civ.R. 1(C) "acknowledges that the General Assembly may create procedural rules for special statutory proceedings that would make a civil rule 'clearly inapplicable.'" *Ferguson v. State*, 2017-Ohio-7844, ¶ 21; Civ.1(C)(8). "There are two considerations in determining whether the Civil Rules do not apply: whether the procedural statute governs a special statutory proceeding and whether the statute renders the civil rule at issue 'clearly inapplicable.'" *Id.*

**{¶ 44}** "'"Special proceeding" means an action or proceeding that is specially created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity.'" *In re Estate of Ohman*, 2023-Ohio-4008, ¶ 27 (6th Dist.), quoting R.C. 2502.02(A)(2). The procedure set forth in R.C. 959.132, which was specially created by statute in 2008 and which prior to 1853 was not denoted as an action at law or a suit in equity, is a special proceeding.

**{¶ 45}** Having clarified that an R.C. 959.132 civil probable cause hearing proceeding is a special proceeding, it is necessary to analyze whether R.C. 959.132 renders any civil rule that may be at issue "clearly inapplicable." "A civil rule is clearly inapplicable "'only when [its] use will alter the basic statutory purpose for which the

14.

specific procedure was originally provided in the special statutory action.'""" *Ferguson* at ¶ 24.

{¶ 46} Hirt does not specify which of the civil rules she believes should apply, but since she references discovery, we will consider the applicability of Civ.R. 26. That rule provides, in relevant part:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

{¶ 47} Applying *Ferguson,* we must consider whether the use of Civ.R. 26 would impermissibly "alter the basic statutory purpose for which the specific procedure was originally provided in the special statutory action.'""" *Ferguson* at ¶ 24. Although Civ.R. 26 generally allows for broad and in-depth discovery – which could arguably defeat R.C. 959.132's apparent purpose of both quickly delivering animals from harm's way and minimizing any negative impact on pet owners' legitimate property interests – the rule also allows for substantial judicial discretion in narrowing the scope of discovery. *See Warman v. LivaNova Deutschland,* 2023-Ohio-4045, ¶ 22 (1st Dist.) (trial court acted within the scope of its discretion in limiting the scope of discovery under Civ.R. 26 to ensure that discovery remained tailored to the needs of the case). Because the rule provides for judicial discretion in determining the scope of allowable discovery, we do

15.

not find that Civ.R. 26 necessarily alters the basic statutory purpose for which the R.C. 959.132 probable cause hearing was originally provided.  Civil Rule 26, therefore, applies to R.C. 959.132 proceedings.

**{¶ 48}** Next, we must consider whether Civ.R. 26 was properly applied in this case.  In general, "[t]he trial court has discretionary power to regulate discovery and its decisions will generally not be overturned absent an abuse of that discretion."  *Ro-Mai Industries, Inc. v. Manning Properties,* 2010-Ohio-2290, ¶26 (11th Dist.), citing *Mauzy v. Kelly Services, Inc.*, 75 Ohio St.3d 578 (1996) and *State ex rel. Daggett v. Gessaman*, 34 Ohio St.2d 55, (1973).  "A court abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *12312 Mayfield Rd., LLC v. High & Low Little Italy, LLC*, 2024-Ohio-2717, ¶ 12 (8th Dist.), citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.  An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).  "Generally, to show that a party has been denied a reasonable opportunity to obtain discovery, a party must show specifically what was needed and why, rather than just speculating that a smoking gun might emerge from a pile of documents."  *Warman* at ¶ 20, citing *Dansberry v. Mercy Health*, 2022-Ohio-360, ¶ 12-14 (1st Dist.).

**{¶ 49}** The trial court determined that the State provided the necessary discovery required for the proceeding.  The discovery provided to Hirt consisted of the February 24, 2025 search warrant (and affidavit in support) and several cost of care documents that

16.

contained a breakdown of the $281,168.00 in total animal upkeep charges. Additional discovery requested by the defense, but not provided included photographic evidence of the scene; specific veterinarian identification information; specific contract documents between the state and any organizations that participated in the seizure, impoundment and keeping of the animals; additional medical and financial records; and miscellaneous writings between those who were keeping the animals and the State. Hirt broadly alleges that she needed the missing discovery because "[t]here is no additional relief available [to her] beyond the probable cause hearing [that] would afford her the chance to discover and challenge the reasons for the confiscations of her animals."

{¶ 50} Upon our review of the record, including the transcript of the R.C. 959.132 hearing in this case, the trial court did not abuse its discretion in restricting discovery in connection with the time-limited civil probable cause hearing in this case. There is no indication that the additional requested discovery would have been of any particular value in helping Hirt either discover or challenge the reasons for the confiscation of her animals. The reasons for the seizures could be discerned in the search warrant and compliance report documents. When these reasons were explained at the hearing by witnesses Pocock and Gonzalez, defense counsel had the opportunity to conduct, and in fact did conduct, extensive and meaningful cross-examination of both.

{¶ 51} Because the risk of an unlawful deprivation of the animals was low, we hold – in addition to no abuse of judicial discretion – that there was no violation of Hirt's constitutional right to due process. *See Mathews*, 424 U.S. at 335. Hirt had notice and an

17.

opportunity to be heard "'at a meaningful time and in a meaningful manner'" in connection with the February 25, 2025 seizure and impoundment of her animals. *See Id.* at 333, quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). For the foregoing reasons, Hirt's first assignment of error is found not well-taken.

### B. Second Assignment of Error

{¶ 52} Hirt argues in her second assignment of error that the search warrant for the February 25, 2025 search was defective since it "was granted on the basis of post hoc allegations," rather than based on information that was available at the time the warrant was issued. Specifically, Hirt complains that warrant affiant Pocock did not go to the Hirt residence after December 19, 2024, when the execution of the second search warrant took place. According to Hirt, on December 19, 2024, she was "making progress" against the compliance order.

{¶ 53} As Pocock stated in her affidavit, it was previously determined during the November 5, 2024 search of Hirt's premises that most of the animals on the property were found to be "in numerous and varying stages of neglect, from minor to severe." Pocock further averred that as of February 24, 2025, Hirt had yet to complete the items listed in the compliance report. Given the previously-discovered conditions and the fact that Hirt had failed to complete the items listed in the compliance report, Pocock believed that investigators would find further evidence to show that Hirt knowingly neglected the animals in her sanctuary that were under her care.

18.

{¶ 54} The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution prohibit unreasonable searches and seizures of persons or property. "Central to those prohibitions is the requirement that search warrants issue based on probable cause." *State v. Long*, 2020-Ohio-4090, ¶ 20 (6th Dist.), citing *State v. Castagnola*, 2015-Ohio-1565, ¶ 34. "In this context, 'probable cause' means that the evidence presented in support of issuing the search warrant is sufficient for the magistrate to conclude that there is a fair probability that evidence of a crime will be found in a particular place." *Id.* at ¶ 20, citing *Castagnola* at ¶ 35. We believe in this case that there was sufficient evidence for the Sandusky County Judge to conclude that there was a fair probability that evidence of a crime would be found on Hirt's premises on or around February 25, 2025.

{¶ 55} Even if the warrant was improperly issued, "the good faith exception to the exclusionary rule allows evidence seized to be admissible provided the police acted in reasonable reliance on the search warrant issued by a detached and neutral magistrate." *State v. Thompson*, 2019-Ohio-4835, at ¶ 52. We find under the circumstances of this case, involving an abundance of evidence suggesting longstanding and not-fully resolved conditions of animal abuse, that even if the warrant was issued in error, it was reasonably relied upon by those who executed it, and so the good faith exception to the exclusionary rule would apply. Hirt's second assignment of error is therefore found not well-taken.

19.

## C. Third Assignment of Error

{¶ 56} Hirt argues broadly in her third assignment of error that the R.C. 959.132 "procedure for confiscation of Hirt's animals is unconstitutional as applied," because "[t]here is no subsequent proceeding expressed in the statute," and because "if the bond requirement exceeds the animal owner's ability to pay, immediate and permanent forfeiture of ownership of the animals occurs by operation of statute," based on "a mere 'probable cause' evidentiary determination preceded by denial of discovery rights that might have allowed Appellant to challenge the basis for seizure of each individual animal."

{¶ 57} Contrary to Hirt's argument, the plain language of the statute demonstrates that the R.C. 959.132 proceeding terminates when the related criminal proceeding is resolved. Under R.C. 959.132(G), if Hirt had been "found not guilty of committing an offense, the court immediately shall order the impounding agency to return the animal to [her] if possible and return the entire amount of any bond or cash deposit posted…" *See State v. Smith*, 2017-Ohio-359, ¶ 33 ("Once the court determined that probable cause for the seizure existed, Smith was able to post bonds and prevent the Humane Society from disposing of her dogs until she was proven guilty at trial.").

{¶ 58} In addition, Hirt received process that was due to the extent that she received adequate discovery. Regarding Hirt's complaint that "[s]he could not meet the $281,168.00 [sic] bond condition and the price of her impecuniousness was the summary loss of ownership of her animals, Hirt specifically argues that R.C. 959.132 functions as

20.

an in personam criminal forfeiture that is "grossly disproportional to the gravity of the offense it is designed to punish." An in personam forfeiture is, indeed "a forfeiture that is used to punish an individual for committing a criminal offense and is thus considered a fine." *State v. O'Malley*, 2022-Ohio-3207, ¶ 37, quoting *United States v. Bajakajian*, 524 U.S. 321, 328, 332. And "to determine whether an in personam criminal forfeiture is constitutionally permissible, courts must conduct a gross-disproportionality analysis to evaluate the fine as compared to the gravity of the offense." *Id.* at ¶ 40; *see also Bajakajian* at 334.

{¶ 59} But in this case, the bond amount was ordered pursuant to R.C. 959.132 and was not used to "punish" Hirt. The record reveals that the $281,168.00 bond was strictly reflective of the actual cost of care and keeping for Hirt's 110 animals for a period of 60 days while the animals were in the custody of the impounding agency. We note that on appeal, Hirt makes no challenge to the accuracy of the $281,168,00.00 figure, which was supported by documentation and was testified to at length during the bond hearing. Her third assignment of error is found not well-taken.

## Conclusion

{¶ 60} The judgment of the Sandusky County Court is affirmed. Hirt is ordered to pay the costs of appeal pursuant to App.R. 24.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.
_____
JUDGE

Myron C. Duhart, J.
_____
JUDGE

Charles E. Sulek, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.